IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KELLY R. SHRADER,

        Plaintiff,

v.                                               Civil Action No. 5:04-CV-88

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

## I.  Introduction

A.    Background

    Plaintiff, Kelly R. Shrader, (Claimant), filed her Complaint on August 16, 2004 seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on October 21, 2004.[2] Claimant filed her Motion for Summary Judgment and Brief in Support Thereof on November 16, 2004.[3] Commissioner filed her Motion for Summary Judgment and Brief in Support Thereof on November 18, 2004.[4]

B.    The Pleadings

        1.    Claimant's Motion for Summary Judgment and Brief in Support Thereof.

        2.    Commissioner's Motion for Summary Judgment and Brief in Support

---

[1] Docket No. 1.

[2] Docket No. 2.

[3] Docket No. 3.

[4] Docket No. 4.

Thereof.

C.      Recommendation

1.      I recommend that Claimant's Motion for Summary Judgment be DENIED because the ALJ was substantially justified in his decision. Specifically, the ALJ gave proper weight to the opinion of Claimant's treating physician.  Also, the ALJ properly determined Claimant's Residual Functional Capacity.  Lastly, the ALJ posed a proper hypothetical to the VE.

2.      I recommend that Commissioner's Motion for Summary Judgment be GRANTED for the same reasons set forth above.

## II.  Facts

A.      Procedural History

 On June 6, 2003 Claimant filed for Disability Insurance Benefits (DIB) alleging disability since August 27, 2002.  The application was denied initially and on reconsideration.  A hearing was held on December 15, 2003 before an ALJ.  The ALJ's decision dated May 6, 2004 denied the claim finding Claimant not disabled within the meaning of the Act.   The Appeals Council denied Claimant's request for review of the ALJ's decision on July 23, 2004.  This action was filed and proceeded as set forth above.

B.      Personal History

Claimant was 30 years old on the date of the December 15, 2003 hearing before the ALJ. Claimant has a high school education and past relevant work experience as a grocery store clerk.

C.      Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability August 27, 2002 - May 6, 2004.

**Terry Orlofske, PA-C, August 20, 2001, Tr. 121**
- Patient underwent flexible cystoscopy on 7/19/2001 for symptoms felt to represent interstitial cystitis. She also had some irritative symptoms and microscopic hematuria as well. He cystoscopy was essentially unremarkable and did not reveal any evidence of tumor or mucosal changes. She did undergo urethral dilatation. She does not note that the dilatation resolved her urinary urgency and irritative symptoms. She was subsequently placed on Macrodantin 50 mg b.i.d. by Dr. Curtis. She has developed failed significant vaginal candidiasis from this. She stopped the Macrodantin several days ago. Urinalysis today does reveal 2-3 rbc's on cath specimen but is otherwise negative. She is otherwise asymptomatic as well.
- An ultrasounds of the kidneys was obtained on 7/19/2001 and revealed a slight variation of the size of the kidneys but it was felt to be within normal limits. The kidney otherwise appear normal and the remainder of the exam was fairly unremarkable except for small cysts on the left ovary.
- Assessment: Urethral syndrome. Microscopic hematuria with negative IVP and ultrasound of the kidneys.

**Terry Orlofske, PA-C, July 19, 2001, Tr. 122**
- Patient had an ultrasound, which is negative kidneys, except for a cyst, and she does also have what appears to be a cystic structure below her bladder on the left, which may be ovarian.
- Assessment: Probably urethral syndrome. Some pain may be related to her endometriosis and the cyst that is noted on ultrasound. Renal cyst.

**Terry Orlofske, PA-C, June 18, 2001, Tr. 123**
- history of irritative symptoms, microscopic hematuria, and chronic UTIs in the past

**Dr. Rodney Curtis, M.D. July 19, 2001, Tr. 125,**
**Ultrasound, retroperitoneum echography**
- There is discrepancy in size of the kidneys with the right kidney somewhat smaller than the left but the ovarian is within normal limits. The kidneys otherwise appeal normal. The remainder of the examination is within normal limits. Several cysts or follicles are incidentally seen in the left ovary.

**Tr. 129 March 19, 2002**
- patient states that her last period was heavy and painful. Pain on left side for 1 month.

**Tr. 130 November 14, 2001**
- patient doing well. Has had bad infection.

**Tr. 132, January 25, 2001**
- patient states recent pelvic kidney ultrasound showed ovarian cyst. Increase in pain.

Patient states no attempt of pregnancy.

**Tr. 132, August 22, 2001**
- consult for hysterectomy.  Long discussion about character of pelvic pain.  Patient opened up about history of molestation.

**Tr. 134, May 22, 2001**
- has been bleeding X 4 days should take 20 cps a day X 1 week.

**Tr. 134, May 23, 2001**
- bleeding heavier clots and pain

**Tr. 135, April 24, 2001**
- having pain and bleeding on continuos OCPs

**Dr. Thomas Harman, February 7, 2001, Tr. 136,**
- This is a pleasant, well-developed white female, in NAD.  BP 114/64.  HT: 5'0".  Neck: without mass.  COR: RRR. LUNGS: CTA.  ABDOMEN: soft and tender in the lower quadrants without mass, there is not hepatosplenomegaly, no hernia, and the aorta is normal but slight tenderness with deep palpation in this area.  Back: shows BL SI joint pain, normal spinal curvature.  External genitalia: EGBUS are within normal limits, there is no vestibulitis or vaginismus.  There is 2+ levator pain, 3+ BL piriformis pain.  The uterus and adnexa are 4+ tender and difficult to feel due to guarding, but the uterus felt retroflexed and slightly fixed, and the adnexa were difficult to determine complete size.
- patient is documented with endometriosis, which is primarily central
- plan is for laparoscopic presacral neurectomy, possibly laparotomy, Pre-op bowel prep.

**Dr. Thomas Harman, July 12, 2000, Tr. 152-53**
- This is a pleasant, well-developed white female, in NAD.  BP 114/64.  WT: 114.  HT: 5'0".  Neck: without mass.  COR: RRR. LUNGS: CTA.  ABDOMEN: soft and tender in the lower quadrants without mass, there is not hepatosplenomegaly, no hernia, and the aorta is normal but slight tenderness with deep palpation in this area.  Back: shows BL SI joint pain, normal spinal curvature.  External genitalia: EGBUS are within normal limits, there is no vestibulitis or vaginismus.  There is 2+ levator pain, 3+ BL piriformis pain.  The uterus and adnexa are 4+ tender and difficult to feel due to guarding, but the uterus felt retroflexed and slightly fixed, and the adnexa were difficult to determine complete size.
- patient is documented with poorly treated endometriosis
- plan is for laparocopy with lysis of adhesions and laser ablation of endometriosis.

**Tr. 155, July 24, 2002, Pap test**
- no evidence of infection
- no significant cytological abnormalities present

**Dr. Jessica Morano, Ultrasound of Pelvis, March 27, 2002**
- transabdominal images were obtained.  The patient refused intravaginal transducer examination.  The uterus is normal is size and configurations and shows normal echo pattern.  The endometrial lining is 7.7 mm in full thickness.  The ovaries appear normal in size and texture.  There is no free fluid seen.
- normal transabdominal images of the pelvis

**Dr. Jessica Morano, Ultrasound of Pelvis, July 6, 2001**
- essentially normal ultrasound examination of the pelvis except for a very small amount of free fluid seen in the cul-de-sac.

**Dr. Joseph Capito, M.D. August, 28, 2002 Tr. 164**
- patient complains of sinus pressure and pain with headaches for a week
- no radiographic evidence of sinonasal inflammatory disease.

**Dr. Sanjay Chaudhry, M.D., August 9, 2002, Tr. 166**
**Colonoscopy with biopsy**
- final diagnosis: mild proctitis
- plan: await biopsies.  High fiber diet.  Follow up with Dr. Morano.  Follow up with me as needed

**Dr. Devender K. Batra, Stress Test, August 21, 2002, Tr. 168**
- test was stopped due to achievement of the target heart rate
- test was negative for angina and ischemia by EKG criteria
- isolated PACs.
- patient achieved 11 METS, more than 85% of maximum predicted heart rate
- need to correlate these findings with the Myoview results

**Dr.  Devender K. Batra, Myocardial Perfusion Scan, August 21, 2002, Tr. 169**
- Normal

**Tr. 172, August 12, 2002**
- Rectal biopsies - edema and inflammation, mild, non-specific.  No dysplasia.

**Tr. 176, June 24, 2002**
- skin lesion from right lower back: polypoid compound nevus.
- post-operative diagnosis: irritated nevus.

**Dr. Krishna R. Urval, MD, January 30, 2003, Tr. 179-80**
- patient who has mild allergic rhinitis with significant non-allergic component and frequent sinusitis.  The headaches are probably related to sinus congestion.  She also has frequent eustachian tube dysfunction.  The plan is once again to place her back on a trial of phinocort aqua nasal spray, one squire each nostril twice a day, and try Zyrtec-D once or twice a day but only on an as needed basis.  If she continues to be bothered by frequent

sinus and ear symptoms, probably the next step is to consider immunotheraphy as a last resort.

**Dr. Michael D. Matthews, D.O., February 2, 2003, Tr. 182-83**
**Emergency Trauma Record**
- chief complaint: possible reaction to oxycodone. Difficulty swallowing and breathing.
- patient was given a prescription for prednisone and zantac
- condition upon discharge: good

**Dr. John D. Freed, M.D. January 19, 2003, Tr. 184-85**
**Emergency Trauma Record**
- chief complaint: nausea and vomiting.
- patient is alert and oriented times three and does not appear to be in any acute distress at this time. EKG showed normal sinum rhythm with no acute ischemic changes noted.

**Dr. W.A. Tiu, December 12, 2002, Tr. 191-92**
- chief complaint: nasal congestion and mild post nasal drip
- assessment: patient reassured there is no clinical sign of sinusitis. Occasional nasal congestion could be secondary to allergic rhinitis. Samples of clarinex were given to take one a day as needed for hay fever symptoms.

**Dr. Fulvio Rogelio Franyutti, Tr. March 14, 2003**
**Residual Functional Capacity Assessment**
EXERTIONAL LIMITATIONS: occasionally lift 50lbs. Frequently 25 lbs. Stand/walk about 6 hours in an 8 hour day. Sit about 6 hours in an 8 hour day. Push/pull unlimited
POSTURAL LIMITATIONS:                  None established.
MANIPULATIVE LIMITATIONS:              None established.
VISUAL LIMITATIONS:                    None established.
COMMUNICATIVE LIMITATIONS:             None established.
ENVIRONMENTAL LIMITATIONS:             None established.

**Ronald Murphy, PA-C, November 14, 2002, Tr. 216**
- diagnostic impression: right otitis media with possible TM perforation. Fibromyalgia. Chronic sinusitis.

**Dr. George Nau, III, D.O., May 2, 2003, Tr. 218**
- DXA bone density: bone mineral density for the lumbar spine and the right hip is in the osteopenic ranges.

**Dr. George Nau, III, D.O., January 22, 2003, Tr. 222**
- mild pectus excavatum deformity. No acute process. There is mild dextroscolisis at the dosolumbar junction.

**Dr. George Nau, III, D.O., December 15, 2002, Tr. 223**

- suspected degenerative changes of the anterior horn of the medial meniscus and the ACL rather than any type of acute tear given their appearance.
- no other acute bone injury or soft tissue abnormality.

**Dr. Thomas Allen Lauderman, Tr. 226-34, June 26, 2003**
**Residual Functional Capacity Assessment**
EXERTIONAL LIMITATIONS: occasionally lift 50lbs. Frequently 25 lbs. Stand/walk about 6 hours in an 8 hour day. Sit about 6 hours in an 8 hour day. Push/pull unlimited
POSTURAL LIMITATIONS:                     None established.
MANIPULATIVE LIMITATIONS:                 None established.
VISUAL LIMITATIONS:                       None established.
COMMUNICATIVE LIMITATIONS:                None established.
ENVIRONMENTAL LIMITATIONS:                None established.
- back and knee problems, fibromyalgia, endometriosis, irritable bowel syndrome, urethral syndrome, prior ear drum problems.

**Dr. Christopher Tiu, M.D., October 30, 2003, Tr. 238-39**
- intermittent daily episodes of vertigo, decreased right hearing, bilateral tinnitus, lasting 5-15 minutes, rules of meniere's disease
- history of heart palpitations. Rule out thyroid disorders as well
- history of right tympanic membrane reconstruction and ossicular chain reconstruction nicely healed
- bilateral mixed sensiosneural hearing loss.

**Dr. Christopher Tiu, M.D., November 24, 2003, Tr. 240-41**
- suspect meniere's disease. Suspect right side because of the decreased hearing and the worse tinnitus on the right. However on recent 9/3 audiogram, her hearing was relatively symmetric. But as is with the nature of the meniere's disease, the history will tell us more about which side is going on.

**Dr. Christopher Tiu, M.D., December 29, 2003, Tr. 257-58**
- patient refused the caloric testing with air because of the history of perforation. She refused the dis-hallpike because it would hurt her neck to bend her back.
- MRI is negative. Saccade testing is normal. Tracking testing is normal. Gaze testing and positional testing is normal.

**Dr. Christopher Tiu, M.D., December 29, 2003, Tr. 257-58**
- meniere's disease, suspect right side given history of intermittent decreased hearing and tinnitus
- hearing within near normal limits on audiogram today
- frequencies of dizziness and significantly improving with increase in dyazide therapy.

D.      Testimonial Evidence

<u>1. Claimant</u>

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 266-71, 273-74 ):

Q      Ms. Shrader, why have you been driving so little?

A      Because of the dizziness spells I've been having, the attacks that they believe are due to Meniere's disease, and my medicines.

Q      What is it about your medicines that affect your driving?

A      They make me a little nauseous and woozy.

Q      How long has your driving been as limited as it is now?

A      I'd say at least a year.

Q      Can you go back with me for the period - - when did these symptoms first begin?

A      On and off for the last four years.  They have worsened within the last year or two.

*          *          *

Q      Why the second MRI?

A      Because I couldn't tolerate the noise.  It brought on one of those attacks where I was real dizzy, and they had to stop.

Q      So is the second one to finish what they started?

A      Right.

*          *          *

Q      Tell me just generally how you feel most days?

A      Nauseated, pain, tired.

Q      Now from your work at Kroger's the last period of time there, it looks like some days you had symptoms, some days you didn't?

A      Yeah, maybe - - I was in pain pretty much every day, but the nausea, probably two or three times a week.

Q      And how about now?  Is that still the same?

A      Yes.  The pain has actually worsened since then.

Q      How has it worsened?

A      I'm getting it, like, all through - - like, in my spine and down into my tailbone, my arms and legs.  It's my whole body.

Q      And is it every day?

A      Yes.

Q      But the nausea is still a couple times a week?

A      Right.

*              *              *

Q      And even with those glasses you have that trouble reading?

A      Yes.  I can't read without - - I can't see anything without my glasses.

Q      Is the - - when you try and read, is it a blurring?

A      Yes, blurry, and then I start seeing spots, and the room starts spinning.

Q      How long can you read before that happens?

A      Probably about 20 minutes, sometimes not even that.

Q      Was that happening when you tried to work as well?

A      Yes.

Q       How is your balance?

A       Not good.  If I stand longer than about 10, 15 minutes, I start to lose my balance, sway to one side or the other.

Q       Have you ever fallen?

A       Yes, I have.  I lost my balance and fell backwards into the bathroom door and hit my left elbow.  I also have fallen down the steps.

Q       When you say that the symptoms started about four years ago, were they - - were those the symptoms of the nausea and the dizziness?

A       Yes.

Q       What about the pain?  When did it start?

A       The pain, I have had for at least five years.  That's - - I believe that's about when I was diagnosed with endometriosis, four or five years ago.  That's when the pain started.

*                    *                    *

A       Yes.  Even when I'm not nauseated, I'm still in a lot of pain. I am - - basically I lie with the heating pad on.  I'll alternate it from my stomach area to my back.

Q       Are you able to do any of the housework?

A       I do laundry, maybe one load once or twice a week, and dishes maybe once a month.  That's about it.  I take care of bills.

*                    *                    *

Q       Are you able to focus and write the checks, add - -

A       Sometimes.

Q       - - and subtract?

10

A       Sometimes I need to stop in between.

Q       Do you read or watch TV?

A       I watch TV.  Sometimes I have to turn the TV off because the noise will start an attack.  Any kind of loud noise or reading.  I haven't been able to read much at all.

Q       And when you say an attack, what exactly happens?

A       When the room starts spinning, and I get real dizzy and start seeing spots, and lose my balance.

Q       Is there anything you can do to make that attack stop?

A       Other than lie down, no.

### 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 279-80):

Q       Okay.  Please assume a younger individual with a high school education precluded from performing all but sedentary work with no hazards such as dangerous and moving machinery, unprotected heights.  Work that is unskilled and low stress, defined as one and two-step processes, routine and repetitive tasks. Primarily working with things rather than people, entry-level.  No climbing, no temperature extremes.  With those limitations, Dr. Ostrowski, sedentary, no hazards, climbing, or temperature extremes, and low stress work as defined, can you name any jobs this hypothetical individual can perform?

A       Yes, Your Honor.  I'll define the local economy as the Bridgeport/Wheeling metropolitan square area [phonetic] which covers Belmont County in Ohio, Marshall and Ohio Counties in West Virginia.  There would be the work of a packer.  In the local regional economy,

11

there are three jobs. In the national economy, there are 7,557 jobs. There would be the work of an assembler. In the local regional economy, there are 14 jobs. In the national economy, 103,841 jobs. There would be the work of a surveillance system monitor. In the local regional economy, there are three jobs. In the national economy, 5,461 jobs.

Q	Are those jobs consistent with the DOT?

A	Yes, Your Honor.

*	*	*

E.	<u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

•	Drives about five miles per week. (Tr. 266).

•	Can read for about twenty minutes. (Tr. 271).

•	Is able to stand for ten to fifteen minutes. (Tr. 271).

•	Can do one to two loads of laundry per week. (Tr. 273).

•	Washes dishes about once a month. (Tr. 273).

•	Writes checks and is able to do some mental mathematics. (Tr. 273-274).

•	Watches television. (Tr. 274).

•	Can go up and down stairs with the help of her husband. (Tr. 278).

•	Does knee exercises. (Tr. 279).

## II. The Motions for Summary Judgment

A.	<u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred in failing to give proper weight to the opinion of Claimant's treating physician. Also, Claimant claims that the ALJ failed to properly consider all of Claimant's impairments when determining her residual functioning capacity (RFC). Finally, Claimant contends that the ALJ erred when he posed the hypothetical to the vocational expert (VE).

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ carefully considered the Claimant's limitations and subsequently gave the Claimant a proper restrictive RFC of less than the full range of sedentary work. The Commissioner further contends that at no time did the ALJ improperly reject, fail to consider, misconstrue or mischaracterize any of the evidence when making his determination.

B.    The Standards.

1.    Summary Judgment.    Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.    Only a final determination of the Commissioner may receive

judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hayes v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.  Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are

unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8. Social Security - Substantial Evidence - Defined. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. Social Security - Sequential Analysis. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10. Evidence - Weight. The ALJ is required to indicate the weight given to all relevant evidence. Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984). However, the ALJ is not required to discuss every piece of evidence. Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995).

11. Social Security - Treating Physician - Controlling Weight - The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). See also Evans v. Heckler, 734 F.2d 1012 (4th Cir.

15

1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

12. Social Security - Ultimate Issue. Whether an individual is disabled or able to work is an issue reserved for the Commissioner. SSR 96-5p. Opinions as to disability or ability to work given by a treating source can "never be entitled to controlling weight or given special significance." Id.

13. Social Security - Residual Functional Capacity. A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. Id. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments. Id.

C. Discussion

### 1. Opinion of the Treating Physician

Claimant asserts that the ALJ did not accord proper weight to the opinion of Claimant's treating physician, Dr. Naum. Commissioner counters that the ALJ gave proper weight to Dr. Naum's opinion.

Whether an individual is disabled or able to work is an issue reserved for the

Commissioner.  SSR 96-5p.   Opinions as to disability or ability to work given by a treating source can "never be entitled to controlling weight or given special significance."  Id.   Dr. Naum's opined that Claimant "remain off [work] due to medical reasons".  (Tr. 252).  Dr. Naum's opinion that Claimant remain off work is not entitled to controlling weight because it is an issue left to the Commissioner.

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. § 416.927(d)(2). While credibility of the opinions of the treating physician is entitled to great weight, it will be disregarded if there is persuasive contradictory evidence.  Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984).

In the present case, the Claimant's argument that the ALJ erred in failing to consider Dr. Naum's opinion is without merit.  Dr. Naum's opinion is not at all supported by medically acceptable clinical and laboratory diagnostic techniques.  The ALJ stated that "little weight is given to these notes as no explanation is given to as to why the claimant cannot work. In addition, this opinion is not supported by the medical records, including Dr. Naum's own treatment notes." (Tr. 20).

Also, Dr. Naum's opinion that the Claimant should cease working is inconsistent with other substantial evidence in the case record.  Dr. Tiu noted improvement in the Claimant's condition. (Tr. 17). Dr. Tiu examined the Claimant's right eardrum and suggested an adjustment in her medications in an effort to help the Claimant's dizzy spells. (Tr. 17).  When the Claimant returned to Dr. Tiu a year later, she told the doctor that "after an adjustment in her medication, her

brief episodes of dizziness and decreased hearing occurred only once or twice a week, as opposed to once or twice a day." (Tr. 17). In making his determination the ALJ "has also considered the opinion of the State medical consultants. The State medical consultants determined that the claimant was capable of performing medium work. Those opinions were based on information contained in the record at the time of the State Agency reconsideration determination in this case, and no medical records generated or provided after that date were considered by the State examiners. However, additional medical evidence received in the course of developing the claimant's case for review at the hearing justifies a conclusion that the claimant's impairments are more limiting than was determined by the State examiners." (Tr. 20). Accordingly, the ALJ found that Claimant was capable of sedentary work rather than medium work that was suggested by the State medical consultants. Therefore, the ALJ properly gave lighter weight to Dr. Naum's opinion when making his determination since it is unsupported by evidence and inconsistent with other evidence in the record.

## 2. Residual Functioning Capacity

Claimant asserts that the ALJ erred in determining Claimant's Residual Functioning Capacity (RFC). Commissioner counters that the ALJ carefully considered the Claimant's limitations and in turn properly determined the Claimant's RFC.

A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or

other persons, of Claimant's limitations may be used.  Id.  These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities.  Id.  This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments.  Id.

The ALJ determined that the "claimant retains the residual functional capacity for sedentary work, lifting no more than ten pounds, sitting for six hours, and standing or walking for two hours, in an eight-hour day.  Additional limitations include no climbing, temperature extremes or exposure to workplace hazards such as moving machinery or unprotected heights." (Tr. 19-20).  The ALJ concluded that the "claimant is limited to entry level, low stress work that is unskilled, routine and repetitive, and involves working with things rather than people." (Tr. 20).  The ALJ determined that Claimant was not completely credible.  There are many inconsistencies in the record concerning the claimant's statements as well as a lack of medical records to support her alleged impairments.  "In February of 2003, the claimant completed a Daily Activities Report and reported that she prepared fast and easy meals and did some household chores including laundry, dusting, paying bills and washing dishes." (Tr. 19).  In addition to her daily activities the claimant also stated during the hearing that she often went out shopping with her husband and read the newspaper and books for one hour and one half hour per day respectively.  (Tr. 88-92). This is a direct contradiction with the claimant's testimony that she rarely performed household chores and could barely read without having an attack.  (Tr. 19).

As discussed above the ALJ properly assessed the medical opinions of Dr. Naum, Dr. Tiu, and the state examiners.  Based on the medical record, Claimant's testimony, and daily living

questionnaire the ALJ properly determined Claimant's RFC.

3. <u>Hypothetical</u>

Claimant contends that the ALJ posed an improper hypothetical to the vocational expert (VE). As previously discussed the ALJ properly determined the Claimant's RFC based on the medical evidence, Claimant's testimony, and Claimant's daily living questionnaire. The hypothetical presented to the VE was based on Claimant's RFC. Therefore, the ALJ posed a proper hypothetical to the VE.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED and the Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ gave proper weight to the opinion of Claimant's treating physician. Also, the ALJ properly determined Claimant's Residual Functional Capacity. Lastly, the ALJ posed a proper hypothetical to the VE.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to parties who appear *pro se* and any counsel of record, as applicable.

DATED: June 21, 2005

<u>/s/ James E. Seibert</u>

JAMES E.  SEIBERT
UNITED STATES MAGISTRATE JUDGE